UNPUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

CONNIE MANSFIELD, Personal
Representative of the Estate of
Harold Mansfield, on behalf of
herself and the Estate,

Plaintiff-Appellee,

No. 96-1904

v.

WILLIAM PIERCE,
Defendant-Appellant.

Appeal from the United States District Court
for the Western District of North Carolina, at Bryson City.
Lacy H. Thornburg, District Judge.
(CA-95-62-2)

Argued: January 26, 1998

Decided: July 27, 1998

Before MURNAGHAN, NIEMEYER, and MOTZ, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Steven Kropelnicki, Jr., CARTER & KROPELNICKI,
P.A., Asheville, North Carolina, for Appellant. Jack Richard Cohen,
SOUTHERN POVERTY LAW CENTER, Montgomery, Alabama,
for Appellee. **ON BRIEF:** Morris S. Dees, Jr., Marcia Bull Stadeker,
SOUTHERN POVERTY LAW CENTER, Montgomery, Alabama; C.

Frank Goldsmith, GOLDSMITH, GOLDSMITH & DEWS, P.A., Marion, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

## OPINION

PER CURIAM:

The Church of the Creator ("Church" or "COTC"), a religious organization dedicated to the advancement and expansion of the white race, has conducted activities at various times through three entities: an unincorporated association, a North Carolina corporation ("COTC-NC"), and a Florida corporation ("COTC-FL"). Connie Mansfield obtained a civil default judgment of $1 million against COTC-FL in 1994 after a COTC adherent murdered her son.

Mansfield subsequently filed suit in federal court against Dr. William Pierce, alleging that Pierce had been the grantee of a fraudulent conveyance from COTC-NC. Mansfield sought to impose a constructive trust on profits realized by Pierce from his sale of the property. A jury delivered a verdict in Mansfield's favor, having concluded that COTC-NC was the alter ego of COTC-FL, and that there had been a fraudulent conveyance of the property from COTC-NC to Pierce. Pierce's renewed motion for judgment as a matter of law was denied, and the district court entered judgment on the verdict. We affirm.

The district court had jurisdiction under 28 U.S.C.§ 1332. We have jurisdiction under 28 U.S.C. § 1291. Pierce filed a timely notice of appeal in accordance with F.R.A.P. 4(a).

I

The present controversy originated in May 1991, when George Loeb murdered Connie Mansfield's son, Harold, in Jacksonville,

2

Florida. Loeb, who was convicted of the murder in July 1992, was a member of the unincorporated COTC. Founded and led by Ben Klassen, the COTC urged white persons to become adherents of "Creativity," described as a "White Racial Religion." The self-proclaimed purpose of the COTC was "the survival, expansion, and advancement of the White Race." COTC members believed that a racial holy war, or "RAHOWA," was necessary to further their cause.

In 1973, Klassen incorporated COTC-FL. Klassen lived in Florida at that time. Eight years later, Klassen moved from Florida to North Carolina and filed articles of incorporation for COTC-NC. Between 1981 and 1992, COTC-FL ceased actively to operate. Although COTC-FL remained legally in existence, Klassen conducted all COTC activities from his property in North Carolina until he transferred control of the Church to Rick McCarty in 1992.

Two weeks before Loeb's conviction on murder charges in Florida state court, in July 1992, COTC-NC conveyed the property at issue in the instant case to Dr. Pierce for $100,000. Pierce, the chairman of the National Alliance, a white supremacist organization, sold the property in January 1994 for $200,000. The parties stipulated before trial that Pierce's profit on the sale was $85,000.

After the transfer of the COTC-NC property to Pierce, Klassen sent the sale proceeds and the COTC's inventory of books to Mark Wilson in Milwaukee, Wisconsin, whom Klassen had chosen to succeed him as "Pontifex Maximus" of the Church. Klassen soon became dissatisfied with Wilson, however, and revoked his appointment in favor of McCarty, a Florida resident. Approximately $50,000, the amount of proceeds remaining from the sale to Pierce, and the majority of the books were transferred to the COTC's new headquarters in Florida.

Klassen committed suicide in August 1993. Although COTC-NC continued legally to exist, there is no record of any activity by COTC-NC after McCarty succeeded Klassen as the head of the Church. McCarty filed articles of dissolution for COTC-FL on February 22, 1994.

On March 7, 1994, Connie Mansfield filed a complaint in Florida state court against COTC-FL, alleging that COTC-FL had engaged in

3

a pattern of racketeering activity that included the murder of her son. See Fl. Stat. Ann. §§ 772.103 & 772.104. Mansfield served process on McCarty as the president of COTC-FL in April 1994. After COTC-FL failed to respond to the complaint or otherwise to appear, Mansfield moved for the entry of default. A default was entered on April 25, 1994, and the court entered judgment for Mansfield in the amount of $1 million on May 2, 1994.

Mansfield filed suit against Pierce on February 27, 1995, in the United States District Court for the Western District of North Carolina. Mansfield alleged that COTC-NC was the alter ego of COTC-FL, and claimed that the sale of the COTC-NC property to Pierce constituted a fraudulent conveyance under North Carolina law.* The district court denied Pierce's motion to join COTC-NC as a defendant. Motions by Pierce for judgment on the pleadings and for summary judgment were also denied.

At trial, Mansfield sought to prove that Klassen had sold the property to Pierce to protect it from a potential civil judgment arising out of the Loeb murder case. Among other evidence, Mansfield produced Klassen's memoirs, in which Klassen expressed concern about civil liability and discussed the sale of the property to Pierce "at a price far below its real value . . . the bargain price of $100,000." There was

_____

*Although Mansfield did not obtain a judgment against COTC-FL until approximately two years after the date of the conveyance to Pierce, a tort claimant is deemed to be a creditor of the tortfeasor from the date of the wrong for the purpose of setting aside a fraudulent conveyance. See Lewis v. Blackman, 448 S.E.2d 133, 135 (N.C. Ct. App. 1994) (holding that a tort claimant was entitled to the protection of N.C. Gen. Stat. § 39-15 even though the conveyances were made before the tort victim had filed suit); see also, e.g., Baker v. Geist, 321 A.2d 634, 635-37 (Pa. 1974) (holding that a tort claimant was a creditor when conveyances were made, even though the tort victim had yet to file suit); Money v. Powell, 139 So. 2d 702, 703 (Fla. Dist. Ct. App. 1962) (holding that "contingent creditors and tort claimants are as fully protected against fraudulent transfers as holders of absolute claims."); Hansen v. Cramer, 245 P.2d 1059, 1060 (Cal. 1952) (en banc) (stating "[i]t is well settled in this state that the relationship of debtor and creditor arises in tort cases the moment the cause of action accrues.").

4

evidence that Pierce knew of Klassen's reasons for selling the property at a price below fair market value.

The jury returned a special verdict finding that COTC-NC and COTC-FL were "essentially the same entity," and that the conveyance of property by COTC-NC to Pierce was fraudulent. Pierce's motion for judgment as a matter of law was denied, and the district court entered judgment on the verdict on May 31, 1996.

II

On appeal, Pierce presents several arguments to support his contention that the district court erred in denying his renewed motion for judgment as a matter of law. Pierce first argues that the evidence adduced by Mansfield was insufficient as a matter of law to prove that COTC-NC was the alter ego of COTC-FL. Next, Pierce maintains that Mansfield failed to prove she was a creditor of COTC-NC. Pierce contends that Mansfield may not use the Florida judgment to establish the fact of COTC-FL's indebtedness to Mansfield because Pierce was not made a party to the Florida proceeding. Pierce also claims that the Florida judgment was rendered invalid by defective service of process. Finally, Pierce argues that even if Mansfield was a creditor of COTC-FL, that COTC-NC must be afforded an opportunity to litigate the alter ego question and the underlying issue of indebtedness. COTC-NC was not made a party to either the Florida suit or the instant litigation.

We review de novo the district court's denial of judgment as a matter of law. Reinhold v. Virginia, 135 F.3d 920, 929 (4th Cir. 1998); Benesh v. Amphenol Corp. (In re Wildewood Litig.), 52 F.3d 499, 502 (4th Cir. 1995). As to any facts found by the jury, however, our review is circumscribed. Price v. City of Charlotte, 93 F.3d 1241, 1249 (4th Cir. 1996), cert. denied, 117 S. Ct. 1246 (1997). The question is whether the evidence, viewed in the light most favorable to Mansfield, was sufficient to permit a reasonable jury to return a verdict in her favor. Reinhold, 135 F.2d at 929; Andrade v. Mayfair Management, Inc., 88 F.3d 258, 261 (4th Cir. 1996). We have noted that an appellant bears a "hefty burden" in establishing that the evidence is insufficient to support a jury verdict, Price , 93 F.3d at 1249; nevertheless "we are not a rubber stamp convened merely to endorse the

5

conclusions of the jury, but rather have a duty to reverse the jury verdict[ ] if the evidence cannot support it." Id. at 1250 (citing Singer v. Dugan, 45 F.3d 823, 829 (4th Cir. 1995)).

A

We first consider whether Mansfield presented evidence sufficient to permit a reasonable jury to conclude that COTC-NC was the alter ego of COTC-FL. We find that the verdict is supported by the evidence.

North Carolina law permits a court to "disregard the corporate form . . . and extend liability for corporate obligations beyond the confines of a corporation's separate entity, whenever necessary to prevent fraud or achieve equity." Glenn v. Wagner, 329 S.E.2d 326, 330-31 (N.C. 1985); see Atlantic Tobacco Co. v. Honeycutt, 398 S.E.2d 641, 643 (N.C. Ct. App. 1990). In the context of affiliated corporations dominated by a common shareholder, the North Carolina Supreme Court has held that the inquiry is whether the two corporations were "so created, controlled, dominated, and used" by the controlling shareholder as to make one corporation the "mere alter ego" of the other. Waff Bros., Inc. v. Bank of N.C., 221 S.E.2d 273, 281 (N.C. 1976); see B-W Acceptance Corp. v. Spencer, 149 S.E.2d 570, 576 (N.C. 1966) (implying that the "corporate structure" would be disregarded if the parent corporation dominated both subsidiaries so that neither subsidiary had a "separate mind, will, or existence"). "If so, the two corporations must be regarded, for the purposes of this litigation, as one and the same person." Waff Bros. , 221 S.E.2d at 281.

The "instrumentality rule" applied by the North Carolina courts in determining whether to pierce the corporate veil consists of three elements: "(1) the domination and control of the corporate entity; (2) the use of that domination and control to perpetrate a fraud or wrong; [and] (3) the proximate causation of the wrong complained of by the domination or control." Atlantic Tobacco Co. , 398 S.E.2d at 643; see Glenn, 329 S.E.2d at 330. Four factors are of primary importance in deciding whether to disregard the separate corporate entity under the instrumentality rule: "(1) inadequate capitalization; (2) non-compliance with corporate formalities; (3) complete domination and control of the corporation so that it has no independent identity; and

6

(4) excessive fragmentation of a single enterprise into separate corporations." Atlantic Tobacco Co., 398 S.E.2d at 643; Glenn, 329 S.E.2d at 330-31. The North Carolina Supreme Court has emphasized, however, that "[i]t is not the presence or absence of any particular factor that is determinative. Rather, it is a combination of factors which, when taken together with an element of injustice or abuse of corporate privilege, suggest that the corporate entity attacked had no separate mind, will, or existence of its own." Glenn, 329 S.E.2d at 332 (internal quotation marks omitted); see Atlantic Tobacco Co., 398 S.E.2d at 643.

The evidence at trial showed that both COTC-FL and COTC-NC were founded by Klassen and were financed, during his lifetime, with Klassen's personal funds. There was substantial evidence that Klassen exercised unilateral control over the corporations, although other individuals were named as directors in various corporate filings. The transaction challenged here, the sale of the COTC-NC property to Pierce, was not authorized by the COTC-NC board of directors, but evidently was undertaken by Klassen without consultation. Similarly, the record fails to show that anyone other than Klassen participated in the decisions to transfer the sale proceeds and the COTC's library of books to Wilson and later, to McCarty. And although the articles of incorporation for COTC-FL provided for the election of directors by COTC-FL members, and for the election of officers by the directors, the evidence indicated that Klassen simply appointed McCarty to the positions of director, President, Secretary, and Treasurer.

There was considerable other evidence of noncompliance with corporate formalities. COTC-FL was administratively dissolved four times between 1973 and 1993 for failure to file an annual report. See Fl. Stat. Ann. § 617.1622. Although Florida law prescribes a minimum of three directors, see Fl. Stat. Ann.§ 617.0803, COTC-FL's annual reports between 1980 and 1990 identify Klassen as the sole director. COTC-FL's 1993 application for reinstatement lists McCarty, Klassen, and Janet Quaise [sic], as officers and directors. Quaife testified, however, that she had not agreed to be a director of COTC-FL, and in fact, had no knowledge that her name had been used on the application for reinstatement. There was no evidence that any director had ever been elected by the COTC-FL members in accordance with the articles of incorporation. McCarty testified that

7

he had never met anyone who purported to be an officer, director, or member of COTC-FL, other than Klassen, and never attended a board meeting or saw a list of members.

The articles of dissolution for COTC-FL filed by McCarty in 1994 stated that the number of directors was one, again in contravention of Florida law. Furthermore, the articles indicated that COTC-FL had no members, notwithstanding the provision in the articles of incorporation for a minimum of three members.

The only corporate documents on file with the North Carolina Secretary of State as of May 16, 1995, with respect to COTC-NC were the articles of incorporation, filed on December 14, 1981, and a notice of resignation from the initial registered agent, Clayman Dean Conner, filed on May 21, 1982. COTC-NC has not designated a registered agent since Conner's resignation. See N.C. Gen Stat. § 55-5-01 (stating that "[e]ach corporation must continuously maintain in this State: . . . a registered agent"). Although North Carolina law has required, since 1990, that an annual report be filed with the Secretary of State, see N.C. Gen. Stat. § 55-16-22, COTC-NC has never filed such a report.

We conclude that the record contained ample evidence to sustain the jury's finding that COTC-NC and COTC-FL were alter egos of Klassen and of each other. Klassen had complete control of both corporations until he transferred command to McCarty. Klassen exercised his control over COTC-NC to cause the sale of the real estate to Pierce at a price well below fair market value, thereby draining the corporation of funds available to satisfy any civil judgment arising out of the murder of Harold Mansfield. Because the evidence supports the jury verdict that COTC-NC and COTC-FL were alter egos, "the two corporations must be regarded, for purposes of this litigation, as one and the same person." Waff Bros., 221 S.E.2d at 281.

B

Next, Pierce argues that the judgment against COTC-FL can not be used to establish the fact of COTC-FL's indebtedness to Mansfield in the instant litigation. Pierce claims that he must be given an opportu-

8

nity to relitigate the issues underlying the default judgment because he was not made a party to the Florida proceeding.

Although it appears the question has not been addressed by the North Carolina courts, the general rule has been stated as follows:

> A judgment which has been obtained by a defrauded creditor is, as against the transferee of the property, conclusive as to the fact of indebtedness on which it is based, provided that the judgment has been rendered by a court of competent jurisdiction, and that there is nothing to show fraud or collusion . . . .

37 Am.Jur.2d Fraudulent Conveyances § 178. See, e.g., Commerce Bank of Lebanon v. Halladale A Corp., 618 S.W.2d 288, 290 (Mo. Ct. App. 1981) (holding that judgment against debtor-transferor was conclusive as to the fact of indebtedness in a suit against transferees to set aside conveyances); Chapline v. North Am. Acceptance Corp., 544 P.2d 682, 685 (Ariz. Ct. App. 1976) (same); see also Giove v. Stanko, 977 F.2d 413, 418 (8th Cir. 1992) (holding that transferees of fraudulent conveyances had no due process right to attack directly a judgment against the debtor-transferor because none of their own property was at risk; the action was against the debtor-transferor's property, not the property of the transferees). Because Pierce has failed to allege that the Florida judgment was obtained through fraud or collusion, we conclude that Mansfield's status as a creditor of COTC-FL was conclusively established by the $1 million default judgment against COTC-FL.

C

Pierce next challenges the validity of the Florida default judgment, arguing that service of process on the dissolved COTC-FL was defective. Under Florida law, process against a dissolved corporation is to be served on "one or more of the directors of the dissolved corporation as trustees thereof." Fl. Stat. Ann. § 48.101. In the instant case, the return of service indicated that process was served on "Church of the Creator Inc (c/o President, Richard McCarty)." Pierce contends that service was ineffective because the summons was not directed to

9

McCarty as a trustee of the dissolved corporation, but to COTC-FL and McCarty in his capacity as president of COTC-FL.

We find no merit to Pierce's argument. Pierce does not dispute that McCarty was a proper person to receive service under§ 48.101. The erroneous identification of the capacity in which Pierce was served is nothing more than a "hypertechnical" defect which does not invalidate the service. See American Hosp. of Miami, Inc. v. Nateman, 498 So. 2d 444, 445-46 (Fla. Dist. Ct. App. 1986) (holding that a variance which "does not result in prejudice to a defendant does not serve to invalidate the service."); cf. Stoeffer v. Castagliola, 629 So. 2d 196 (Fla. Dist. Ct. App. 1993) (finding defective service where process against a dissolved corporation was served on the corporation's registered agent, who was not a director).

D

Finally, Pierce maintains that the judgment against COTC-FL cannot bind COTC-NC unless COTC-NC is afforded an opportunity to litigate the alter ego question and contest the issue of indebtedness. Pierce relies principally on Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100 (1969). In Zenith, the district court entered judgment against both the named defendant, Hazeltine Research, Inc. ("HRI"), and its parent company, Hazeltine Corporation ("Hazeltine"), based on a pretrial stipulation that Hazeltine and HRI were alter egos. Noting that Hazeltine had not been a party to the litigation, or to the stipulation, the Supreme Court held that the Court of Appeals had correctly vacated the judgment against Hazeltine, stating:

> It is elementary that one is not bound by a judgment in personam resulting from litigation in which he is not designated as a party or to which he has not been made a party by service of process. The consistent constitutional rule has been that a court has no power to adjudicate a personal claim or obligation unless it has jurisdiction over the person of the defendant.

Id. at 110.

10

Zenith is readily distinguishable from the instant case. Mansfield sought to prove that COTC-NC and COTC-FL were alter egos in order to establish the fact of COTC-NC's indebtedness to her, a necessary element of a suit to set aside a fraudulent conveyance. Mansfield, however, has not sought an in personam judgment against COTC-NC, an entity which both parties agree is, for all practical purposes, nonexistent. There is no question that the district court had personal jurisdiction over Pierce, the party against whom judgment was entered. And unlike Hazeltine, Pierce has had a full and complete opportunity to litigate the alter ego question, and to defend against Mansfield's allegation that the conveyance from Klassen to Pierce was fraudulent.

III

In sum, we conclude that the evidence is sufficient to support the jury verdict that COTC-FL and COTC-NC were alter egos. Furthermore, we hold that the default judgment against COTC-FL was not rendered invalid by the technical defect in service of process, and that the district court properly permitted Mansfield to use that judgment to establish the fact of COTC-FL's indebtedness. Finally, we are not persuaded that the judgment is rendered infirm by COTC-NC's absence. Accordingly, the judgment of the district court is hereby

AFFIRMED.

11